Good morning. If it pleases the Court, on behalf of Petitioner Girish Sareen, Mr. Ghulam Hussein, a native and citizen of Burma, presently also known as Minamar, demonstrated unequivocally through his statements that he was an ex-student who was involved in trying to change the government of Minamar through democratic means, and because of that, faced past persecution and was brutalized and persecuted in that country. The immigration judge's decision before the Board of Immigration Appeals was picked apart like a smorgasbord and is selected to take certain pieces and is selected not to take certain pieces. They found the immigration judge's decision to be speculative. They found it to be based on unreasonable grounds, and they left it up to the petitioner to determine which grounds they felt he should be impeached on. We dealt with that in our brief, and we believe that he wasn't in any manner impeached or inconsistent in his testimony. And based on the country conditions, clearly demonstrated past persecution and a well-founded fear if he's presently returned to Minamar. If I could keep the remaining time for rebuttal, if anybody has any questions. Well, I do. You haven't really mentioned anything about the cap claim. Are you pursuing it? If our claims for asylum and past persecution are well-founded, aren't given, we are pursuing it with this Court. We will. Only if that's true. If only those are denied. All right. Are there no other questions? If I could keep the remaining time. Thank you, counsel. Thank you. May it please the Court. I am Lindsay Williams, and I'm representing the Respondent. Today, we respectfully request that this Court deny the petition for review because substantial evidence supports the immigration judge's adverse credibility determination in this case. Mr. Hussain's testimony was vague, inconsistent, and you could not provide corroborating documents that should have been available to him which could have lent credibility to his testimony. Under what circumstances must corroborating documents be furnished? Your Honor, in this circuit, the Court has held that in situations where there are reasons for an immigration judge to doubt the credibility of a petitioner's testimony, that corroborating documents can be submitted to the immigration judge in order to strengthen the weaker parts of the petitioner's testimony. So if we felt that the I.J. was wrong in his credibility determination, there would not be a need for corroborating documents? At this stage, that isn't necessarily correct, Your Honor. Before the immigration judge, if the immigration judge has not made a credibility, an adverse credibility determination, if there's no reason for the immigration judge to doubt the credibility of the petitioner, then corroborating documents this Court has held are not always required. At this stage, were the Court to overturn the immigration judge's adverse credibility determination, the Respondent's position is that the Court would remand to the Board in order to make a finding, taking all of the testimony of the petitioner as true with respect to all three of his claims. So at that point, we wouldn't order corroborating documents to be furnished? This Court has held, Your Honor, that corroborating documents are not required when a petitioner's testimony is found to be credible. When it's found to be concise, exact, and believable, which is not the situation here. Petitioner attempts to make light of the various inconsistencies in his testimony in this brief. Just to name them briefly, with respect to his medical records, it's not just the fact that he wasn't able to submit them to the Court, it's the fact that at one point he says that they were left in Rangoon, at another point he says he had to destroy them before he left. With respect to his NLD membership card, it's not just the fact that he wasn't able to produce it, it's the fact that at one point he said, I couldn't bring it with me, I had to escape as soon as I found out that I could leave, I left my membership card in Rangoon, I cannot get it, I hid it in the house, my wife doesn't know where it is, she couldn't send it to me because she couldn't find it, and then finally he said, I destroyed it before I left. So it's not simply the fact that he couldn't produce it, it's also the fact that there was inconsistent testimony regarding that. Additionally, his hospital stay, he said he was in the hospital for two weeks once he was released from detention, which would have been on December 25th, 1991, but then in another point in his testimony he said that he was present at the birth of his daughter, which was December 27th, 1991. When asked why the discrepancy, he explained that in the week between when he was released from detention, he went to be with his wife and his daughter and then checked himself into a hospital a week later for two weeks of treatment. He testified that the treatment he received was for injury to his legs. There was no testimony, when he testified actually about the beatings or the treatment that he received when he was in prison, he did not testify to any injury to his legs. They were all injuries to his back and to his head. Additionally, in his asylum application, in the statement attached, he also said the injuries were to his head and his back. The NLD pamphlets, he could not present the pamphlets and could not provide a detailed description of what was contained in the pamphlets. His testimony regarding the identities of other NLD members, at one point he stated that during his detention, he was beaten and interrogated and he finally had to reveal the identities. Later in his testimony, he stated that he never revealed their identities and in his asylum application, he stated that he did have to reveal their identities. With respect to the document he was forced to sign when he was released from detention, at one point he said he didn't have time to read it, he didn't know what it said. At another point, in his asylum application, he was very specific and said that the letter stated that he was involved in the event that provoked instability and if there was another demonstration at the university, he would be held personally responsible. At another point, he testified with a more vague description of what was contained in the pamphlet. The date of his studies, at one point he said that he was studying physics at the university in Rangoon in 1991. However, he received his master's degree in 1988, or I believe 89 actually. Additionally, his testimony with regard to his courier activities was vague as well. So taking all of these into consideration, substantial evidence clearly supports the immigration judge's adverse credibility determination and Petitioner tries to put the focus on the fact that the immigration judge was requiring corroborating evidence but as we discussed in the beginning of my argument, corroborating evidence is required in order to bolster testimony that has been found to be unbelievable or vague. Additionally, Petitioner sets forth two other arguments in his brief. First, he sets forth the argument that the immigration judge and the board failed to consider country conditions and with respect to that claim, that claim was not specifically raised before the board and because it's a jurisdictional issue, respondent raises that today and just would like to state that that was not raised in the appeals to the board and therefore this court lacks jurisdiction over the claim. However, even if the court feels that it has jurisdiction to consider the claim, the claim lacks merit because there's no evidence in the record that the immigration judge did not consider the documentary evidence that was submitted by Petitioner. It was submitted along with his asylum application and as the Ninth Circuit is held, we assume that government officials carry out their duties in good faith. The immigration judge had that material before him. And finally, the immigration judge is not required to rely on documentary evidence, as we stated before, if the applicant is not credible. And finally, Petitioner tries to blame the adverse credibility determination on problems with the translation. And just to quickly address that, he never raised this concern during his hearing and actually the record reflects times during his testimony where the translator asked the judge to ask the Petitioner to wait until he finished translating the question because it seemed that the Petitioner was understanding the question in English. Further, the times that Mr. Cousteau You find lots of times where it's clear that there's something wrong with the answers that either the translator didn't understand or somebody didn't understand. I mean, the answers are not the kind of answers that anybody could give. It's not that they're attempts to deceive, but they just are almost gibberish. Correct, Your Honor. Having looked at many transcripts from these proceedings, I can agree that oftentimes there appear to be something that is lost in translation. And the point of Respondent bringing up this point is not to say that these problems with the translation or alleged problems with the translation were the Petitioner trying to be deceitful, but simply that Petitioner's allegation now that the adverse credibility determination was really due to the fact that the translator wasn't translating correctly is a claim that's without merit. If that had been a concern, he could have raised it during the hearing. He didn't. And then looking at the record, it's clear the translator says at several points, Your Honor, please ask him to slow down. Please ask him to let me finish my sentence. It seems he understands the English. And the times that Petitioner has quoted in his brief actually are times when the Petitioner was mumbling in response to the translator, and those were times when he was trying to explain discrepancies. Now, did he raise the issue to the Board? He did raise the translation problems before the Board. He did. I don't think you can fault people for not raising it at the hearing. I mean, they don't really necessarily know what was going wrong until later reading the transcript. Your Honor, I agree with you completely if, in retrospect, it is realized that something has clearly been translated incorrectly. I meant to say December 11, 1991. It was translated December 11, 2001. In this particular situation, that's not the case. It's not that the Petitioner can point to any one translation that was incorrect. In fact, he simply is saying, there were these times when we weren't understanding each other. And looking at the record, part of the reason that the translator was not able to understand the Petitioner is because he was mumbling, not because of some problem in understanding the language he was speaking. I see my time is up, so if there are no further questions, the government rests. Thank you, Your Honor. Thank you. Thank you very much. Just on the last part, the record speaks for itself. The translator clearly indicated he couldn't translate, and the judge admonished him and said, don't say that, do your job. I don't know, counsel wasn't there, I wasn't there, I don't know. No, that's not what it was. The translator said, this doesn't make sense. Right. And that's what the I.J. said, don't say that. And then he said, I cannot translate it. But he said, he's mumbling. And the I.J. then said, just translate exactly what he says. And then the translator went on to say, I cannot translate it, it doesn't make sense. I understand. But what the I.J.'s comment was directed to was that it doesn't make sense, which can be interpreted two ways. And he was telling the translator, you do your job, and I'll decide whether it makes sense. That is correct. All right. Insofar as the courier, my client testified credibly that he was a courier and the envelopes were sealed. What counsel isn't saying is that the judge obviously didn't take judicial notice. This is a matter that occurred in 91. He's testifying in 2002. His application clearly indicates he was beaten throughout his whole body, all over. He didn't specifically say thighs or legs, he said throughout my whole body. That's why I got medical treatment. Now, he's testifying 11 years later, and counsel wants him to say, why didn't he mention legs? I think that's not a proper way to raise an adverse credibility issue. That is not an adverse credibility issue. The other issue is he's mentioning as a student, if we take 11 years from today and we see some monk today who comes to the United States 11 years from today and states he was involved in demonstrations, we know that the monks right now are spearheading the democratic movement in Myanmar in 1988 to 1991. It was the students, and he was a student at that time. He did graduate in 88. He couldn't get a job. He remained in the university. That is not an inconsistency. He stated that he stayed there because he wanted to carry on his political activities. So when counsel says, bring your NLD card, his family would be shot. This is one of the most brutal regimes in the world. How do you corroborate that? How do you corroborate a courier that is delivering sealed envelopes from one democratic leader to another? See, that's not the problem. The problem is that he didn't say that. He said three different things, all of which can't be true. What were the three things? I apologize, Your Honor. He hid the card. He destroyed the card. And it was someplace in... I think there's a confusion on the medicals and on the card. He did say he hid the card because he didn't want to be found with the card, and later he destroyed it. Insofar as the medicals, I'm unclear whether he said he destroyed his medicals. I don't want to testify on the medicals at this time. I don't believe he said anything about the medicals being destroyed. He just didn't have any. That is correct. So when counsel said he said he destroyed it, I think that is making up facts. He never said that in his record that he destroyed his medicals. He just said he can't get them, and he's not going to get his wife to get them. And looking at the regime, it makes sense what he's saying. Now, his daughter is born on December 27th. It makes sense that he'd be at his daughter's birth, and then he'd get his medical treatment. But he's testifying 11 years later. I mean, we're not talking of an event that took place two days before. It's something that he's trying to recollect through a translator and tell the best. And he's telling the judge, I'm telling the truth. There were no inconsistencies. There may have been issues where it wasn't clear, and he tried to clear it, and he gave an explanation. And the immigration judge obviously was unfamiliar with the country conditions. He could not understand why the NLD today would only have, that is in 2002, 5,000 members, and they were able to win 80 percent of the vote in 1990 simply because everybody was jailed or killed. He never read the country conditions. Myanmar is one of the most brutal regimes in the world, and you can't smuggle documents out of there. You can't bring documents up. There are no corroborating documents. So my client either falls or dies on his testimony, and I believe the judge's adverse credibility was found by the BIA, in fact, to be speculative. They themselves say they will not hold or maintain the speculation conjecture by the judge or certain various other inconsistencies that the judge found. But they don't state, and this is the problem with the BIA decision, what they found to be adverse credible. We had to pick that out in our brief and deal with it, and one of the issues was on the courier, why he could not, the judge says, why don't you know what's inside the sealed envelopes? Not why you gave three different answers regarding the destruction of your card or not having your card. So, I mean, just from our perspective, the judge did not understand our client's claim and did not understand the country that he was coming from. Thank you very much. Thank you, counsel. Cases to argue will be submitted.
judges: Fletcher, Reinhardt, Rymer